[995 NE2d 110, 972 NYS2d 148]

Altshuler Shaham Provident Funds, Ltd., Appellant, v GML Tower, LLC, et al., Defendants, The Pike Company, Inc., et al., Respondents.

Argued May 2, 2013; decided June 11, 2013

## POINTS OF COUNSEL

*D'Agostino, Levine, Landesman & Lederman, LLP*, New York City (*Bruce H. Lederman, Eric R. Garcia* and *Christopher M. Tarnok* of counsel), and *Hancock & Estabrook, LLP*, Syracuse (*John G. Powers* of counsel), for appellant. I. The 2008 consolidated mortgage was recorded pursuant to the 2008 amended commitment and not pursuant to the 2007 commitment. II. The 2008 consolidated mortgage is not a building loan mortgage under Lien Law § 22 because it was not made pursuant to a building loan contract providing for future advances and expressly requiring use of mortgage proceeds for improvements to real property. (*Alden State Bank v Sunrise Bldrs., Inc.*, 48 AD3d 1162; *Pawling Sav. Bank v Hunt Props.*, 225 AD2d 678; *Juszak v Lily & Don Holding Corp.*, 224 AD2d 588; *Finest Invs. v Security Trust Co. of Rochester*, 96 AD2d 227; *Weaver Hardware Co. v Solomovitz*, 235 NY 321.) III. The public policy of enabling contractors to learn what sums would be available from a mortgage does not require filing an expired and unenforceable agreement. (*Rosenblum v Tilden Improvement Co.*, 136 App Div 743.) IV. The subsequently filed mechanic's liens should be subordinate to the original $5,500,000 acquisition refinancing if Lien Law § 22 applies. (*Yankee Bank for Fin. & Sav., FSB v Task Assoc., Inc.*, 731 F Supp 64; *HNC Realty Co. v Golan Hgts. Devs.*, 79 Misc 2d 696.) V. Issues of law presented on the face of the record may be raised on appeal whether or not specifically raised below. (*Telaro v Telaro*, 25 NY2d 433; *Persky v Bank of Am. N.A.*, 261 NY 212.) VI. Defendants could not be misled by filed documents because there was a $5,500,000 mortgage of record when they commenced work, and when the 2008 consolidated mortgage of $10,000,000 was filed, it was

fully funded. (*Dearstine v Carpenter*, 106 Misc 102; *Sackman-Gilliland Corp. v Lupo*, 55 AD2d 1008.) VII. Claims of priority over the interim unsecured loans are moot because the real property sold at auction for less than the acquistion mortgage and/or lump sum financing at closing.

*Hahn, Loeser & Parks, LLP* (*Timothy M. Bittel*, of the Ohio bar, admitted pro hac vice, of counsel), and *Gilberti Stinziano Heintz & Smith, P.C.*, Syracuse (*Kevin Roe* and *John L. Stinziano* of counsel), for The Hayner Hoyt Corporation, respondent. I. Appellant is barred by judicial estoppel. (*Riverside Syndicate, Inc. v Munroe*, 10 NY3d 18; *Moore v County of Clinton*, 219 AD2d 131; *Secured Equities Invs. v McFarland*, 300 AD2d 1137; *Kimco of N.Y. v Devon*, 163 AD2d 573.) II. Because appellant failed to raise the argument that the original loan agreement was either "preliminary," "expired" or "unenforceable" in the lower court, this Court should not consider such argument on appeal. (*Quain v Buzzetta Constr. Corp.*, 69 NY2d 376; *ICS/ Executone Telecom v Performance Parts Warehouse*, 171 AD2d 1066; *Catamount Enters. v Town of Lyons Assessors*, 244 AD2d 913; *Arvantides v Arvantides*, 106 AD2d 853; *Enderby v Keppler*, 184 AD2d 1058; *Matter of Van Wormer v Leversee*, 87 AD2d 942; *Rentways, Inc. v O'Neill Milk & Cream Co.*, 308 NY 342; *Lindlots Realty Corp. v County of Suffolk*, 278 NY 45.) III. The three loan agreements are unfiled building loan contracts. (*HNC Realty Co. v Bay View Towers Apts.*, 64 AD2d 417; *Oriskany Falls Fuel v Finger Lakes Gas Co.*, 186 AD2d 1021; *Olson v Kehoe Component Sales*, 242 AD2d 902; *Fishler v Fishler*, 2 AD3d 487; *805 Third Ave. Co. v M.W. Realty Assoc.*, 58 NY2d 447; *Nichols v Nichols*, 306 NY 490; *Slatt v Slatt*, 64 NY2d 966; *Havel v Kelsey-Hayes Co.*, 83 AD2d 380; *Allright N.Y. Parking v Shumway*, 94 AD2d 962.) IV. Failure to file the original loan agreement is the first violation of Lien Law § 22. (*Nanuet Natl. Bank v Eckerson Terrace*, 47 NY2d 243.) V. Failure to file the memorandum of understanding dated May 1, 2007 is a second violation of Lien Law § 22. (*Security Natl. Bank v Village Mall at Hillcrest*, 85 Misc 2d 771.) VI. Failure to file amendment No. 1 dated March 4, 2008 is a third violation of Lien Law § 22. (*Security Natl. Bank v Village Mall at Hillcrest*, 85 Misc 2d 771.) VII. The failure of appellant Altshuler Shaham Provident Funds, Ltd. to file the three loan agreements makes The Hayner Hoyt Corporation mechanic's lien superior to any mortgage claim of appellant Altshuler. (*McDermott v Lawyers' Mtge. Co.*, 232 NY 336; *Dearstine v Carpenter*, 106 Misc 102; *Sackman-Gilliland Corp. v Lupo*, 55 AD2d 1008; *Rosenblum v Tilden Improvement*

Co., 136 App Div 743; *Pennsylvania Steel Co. v Title Guar. & Trust Co.*, 50 Misc 51, 120 App Div 879, 193 NY 37; *HNC Realty Co. v Bay View Towers Apts.*, 64 AD2d 417.)

*Pappas, Cox, Kimpel, Dodd & Levine, P.C.*, Syracuse (*Thomas P. Givas* of counsel), for L.A. Painting, Inc., respondent. I. The March 29, 2007 agreement was a building loan contract. (*Matter of Cohen*, 209 App Div 415; *Howard Sav. Bank v Lefcon Partnership*, 209 AD2d 473; *Alden State Bank v Sunrise Bldrs., Inc.*, 48 AD3d 1162; *Pawling Sav. Bank v Hunt Props.*, 225 AD2d 678; *Finest Invs. v Security Trust Co. of Rochester*, 96 AD2d 227; *Amsterdam Sav. Bank v Terra Domus Corp.*, 97 AD2d 41; *Security Natl. Bank v Village Mall at Hillcrest*, 85 Misc 2d 771.) II. Plaintiff's failure to file the loan agreement requires that its entire interest be subordinated.

*Byrne, Costello & Pickard, P.C.*, Syracuse (*Jordan R. Pavlus* and *Terry R. Pickard* of counsel), for TAG Mechanical Systems, Inc. and others, respondents. I. Plaintiff's new arguments need not be considered. (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 540 US 1017.) II. Plaintiff's contradictory arguments are precluded by the doctrine of judicial estoppel. (*Riverside Syndicate, Inc. v Munroe*, 10 NY3d 18; *North Fork Bank v Cohen & Krassner*, 44 AD3d 375; *Kimco of N.Y. v Devon*, 163 AD2d 573; *Moore v County of Clinton*, 219 AD2d 131; *Secured Equities Invs. v McFarland*, 300 AD2d 1137.) III. Plaintiff is precluded from making arguments for the first time on appeal. (*Bingham v New York City Tr. Auth.*, 99 NY2d 355.) IV. The rarely invoked exception for new points of law does not apply. (*Misicki v Caradonna*, 12 NY3d 511; *Matter of State of New York v Avco Fin. Serv. of N.Y.*, 50 NY2d 383; *Morgan v State of New York*, 90 NY2d 471; *Bingham v New York City Tr. Auth.*, 99 NY2d 355; *Atlantic Bank of N.Y. v Forrest House Holding Co.*, 234 AD2d 491; *HNC Realty Co. v Golan Hgts. Devs.*, 79 Misc 2d 696; *Nanuet Natl. Bank v Eckerson Terrace*, 47 NY2d 243; *Matter of Gregory v Board of Appeals of Town of Cambria*, 57 NY2d 865; *County of Nassau v Cuomo*, 69 NY2d 737; *Gramercy Equities Corp. v Dumont*, 72 NY2d 560.) V. Plaintiff entered into a series of unique transactions which also failed to comply with Lien Law § 13 and it concedes this point on appeal. (*Monroe Sav. Bank v First Natl. Bank of Waterloo*, 50 AD2d 314; *Quain v Buzzetta Constr. Corp.*, 69 NY2d 376.)

*Phillips Lytle LLP*, Rochester (*Mark J. Moretti* of counsel), for The Pike Company, Inc., respondent.

*Stewart L. Weisman*, Manlius, for Pyramid Roofing & Sheet Metal Co., Inc., respondent.

**OPINION OF THE COURT**

READ, J.

This mortgage foreclosure action arises from a failed redevelopment of the Hotel Syracuse complex in downtown Syracuse, New York. The complex consists of several properties interconnected by pedestrian bridges: the hotel, built in 1924 and closed in 2004, and its separate garage (the hotel property); a 15-story tower constructed in the early 1980s as an addition to the hotel (the tower building); and a building formerly housing a major department store, vacant since the early 1990s (the Addis building). The lender for the redevelopment and numerous mechanic's lienors dispute the priority of their respective claims to the foreclosure sale proceeds from the auction of the tower building, a matter governed by Lien Law § 22.

## I.

In September 2005, defendant GML Tower, LLC (GML Tower) purchased the tower building for $7 million, and GML Syracuse LLC (GML Syracuse) and GML Addis LLC (GML Addis) bought the other two parcels making up the hotel complex for an additional $2.75 million. The predecessor of a now-defunct Illinois-based bank loaned the GML entities $7 million for acquisition of these properties, as evidenced by a promissory note and secured by the purchase-money mortgage in that amount, both dated September 7, 2005. The mortgage, recorded in the Onondaga County Clerk's office on September 8, 2005, encumbered all three parcels.

On March 29, 2007, Perfect Provident Fund Ltd., the predecessor of plaintiff Altshuler Shaham Provident Funds, Ltd. (collectively, Altshuler) entered into a "Loan Agreement" (the 2007 loan agreement or the agreement) with GML Tower and its parent company, Ameris Holdings, Inc. (Ameris), whereby Altshuler agreed to loan them $10 million, bifurcated into tranches of $5.5 and $4.5 million. The entire principal amount of the loan was due and payable, with accrued interest at 12% per annum, on March 29, 2010. To secure payment of the amounts owing to Altshuler under the agreement, GML Tower and Ameris undertook to grant Altshuler a "first ranking senior [l]ien, mortgage, pledge, charge and security interest" (which the agreement referred to collectively as the security interest) in, among other collateral, the property and improvements made thereon.

The loan proceeds were to be deposited in a trust account as of the date of the agreement's execution and delivery (i.e., Mar.

29, 2007), and released by the trustee on the closing date, April 30, 2007, "for immediate repayment" to the Illinois-based bank of the outstanding principal amount of the original $7 million dollar acquisition financing (the $5.5 million tranche); and for deposit into another dedicated bank account (the restricted account) to be "held . . . and disbursed, used and applied solely to finance" improvements of the tower building, based upon construction progress as determined by an inspector appointed by Altshuler (the $4.5 million tranche). The 2007 loan agreement seems to have contemplated redevelopment of the tower building into residential condominiums and commercial space.[1]

When the transaction did not close on April 30, 2007, Altshuler entered into a "Memorandum of Understanding" (the MOU) with GML Tower and Ameris "[i]n connection with" the agreement. The MOU, dated May 1, 2007, set closing dates for the $5.5 million and $4.5 million tranches of May 1 and May 15, 2007, respectively. The first of the two tranches timely closed, resulting in transfer of $5.5 million from the trust account to the Illinois-based bank on May 2, 2007. By an "Assignment of Note and Mortgage," executed April 19, 2007, the bank assigned the September 7, 2005 promissory note and mortgage to Altshuler. Altshuler recorded this instrument in the Onondaga County Clerk's office on May 3, 2007, along with a "Mortgage Extension and Modification Agreement," dated April 30, 2007, which established $5.5 million as the maximum principal indebtedness secured by the mortgage covering the hotel complex (the 2007 mortgage).

The parties failed to close on the $4.5 million tranche in accordance with the MOU. Instead, on six separate occasions from May 24, 2007 though February 21, 2008, the trustee released monies totaling $2.5 million from the trust account to GML Tower, pursuant to the parties' joint instructions and advance letters. These disbursements were personally guaranteed by Ameris's principal.

Then on March 4, 2008, GML Tower and Ameris entered into "Amendment No. 1" (the 2008 amendment or the amendment) of the 2007 loan agreement with Altshuler. The 2008 amendment changed the improvements to be built and the terms and conditions of the release to GML Tower and Ameris of the remaining funds held in the trust account (defined as the

---

1. The plans for renovation, improvements and marketing of the tower building, exhibit B to the agreement, are not included in the record.

remaining loan proceeds in the principal sum of $2 million plus accrued interest and less certain outstanding fees and expenses); and provided for the delivery of additional collateral to Altshuler as security for the $10 million loan.[2] To these ends, the 2008 amendment called for construction of residential and commercial rental units in the tower building rather than condominiums; added the Addis building as collateral; and eliminated the restricted account, providing instead for the trustee to release the remaining funds to GML Tower on March 6, 2008, the new closing date, as an unrestricted lump sum. With the disbursement of these funds, the existing promissory note was canceled and replaced and restated by a replacement note (the 2008 note), the guaranties covering the $2.5 million were rescinded, and Ameris's principal gave a new personal guaranty in the principal sum of $250,000. Additionally, the lien of the mortgage was apparently released with respect to the hotel property owned by GML Syracuse.

Concomitantly, GML Tower and GML Addis entered into a "Mortgage Increase, Modification, and Spreader Agreement" (the 2008 mortgage) with Altshuler on March 4, 2008. The 2008 mortgage extended the reach of the 2007 mortgage to cover the Addis building in addition to the tower building, and increased the principal amount secured from $5.5 to $10 million. The 2008 mortgage was recorded in the Onondaga County Clerk's office on March 7, 2008. To provide Altshuler with additional collateral, GML Tower and GML Addis also executed an "Assignment of Leases and Rents" with respect to the tower and Addis buildings, dated March 4, 2008 and recorded in the Onondaga County Clerk's office on March 7, 2008 (the 2008 assignment).

On December 4, 2008, Altshuler commenced this foreclosure action against Ameris, GML Tower and GML Addis,[3] and other defendants, including The Hayner Hoyt Corporation (Hayner), Syracuse Merit Electric (Merit) and the Pike Company, Inc. (Pike) (collectively, the mechanic's lienors). Hayner, Merit and

---

2. The 2008 amendment, a 41-page document plus annexes and exhibits, refers to the 2007 loan agreement as the "Original Loan Agreement," as "supplemented and modified" by the MOU.

3. These GML entities and Ameris eventually defaulted in this litigation, as did another defendant, Ameris's principal, who had given his personal guaranty for $250,000 when Altshuler transferred the loan proceeds remaining in the trust account (roughly $2 million) to GML Tower and Ameris on March 6, 2008 pursuant to the 2008 amendment.

Pike began work on the tower building on July 16, 2007, January 20, 2008 and September 4, 2007, respectively; and filed notices of mechanic's liens on October 31, 2008, December 3, 2008, and September 18, 2009, respectively. Altshuler alleged that GML Tower and Ameris were in default under the terms of the 2007 loan agreement, as modified by the 2008 amendment, and the 2008 note, and that GML Tower and GML Addis were in default under the terms of the 2008 mortgage and the 2008 assignment because mechanic's liens totaling more than $3.755 million had been filed against the tower building, and because they failed to pay real property taxes on the tower and Addis buildings.

Altshuler sought foreclosure of both buildings and recoupment of the full amount of its $10 million loan, together with interest and late charges, and first priority to the proceeds of the foreclosure sales of the two properties. The mechanic's lienors, for their part, moved or cross-moved for summary judgment, seeking an order that their liens were superior to the 2008 mortgage that Altshuler sought to foreclose. The mechanic's lienors also contested the priority of liens as amongst themselves.

In a decision dated May 17, 2010, Supreme Court observed that the parties acknowledged that Lien Law § 22 subordinates a building loan mortgage made pursuant to an unfiled building loan contract to subsequently filed mechanic's liens, but disputed whether the 2007 loan agreement was a building loan contract (see 28 Misc 3d 475, 478 [Sup Ct, Onondaga County 2010]). The judge ultimately concluded that it was: the loan agreement was made between a lender and an owner of real property; GML Tower and Ameris made an express promise to construct improvements to the property; Altshuler agreed to make periodic advances of $4.5 million to fund these improvements; Altshuler was to be informed of construction progress; and the $10 million loan was to be secured by a mortgage on real property, and "even label[ed] itself a 'construction loan transaction[ ]' " (id. at 479-480).

The judge additionally rejected Altshuler's alternative argument that it was at least entitled to priority with respect to the $5.5 million used to refinance the tower building's acquisition. She concluded that the entire $10 million mortgage was subordinate to the subsequently filed mechanic's liens, relying on Atlantic Bank of N.Y. v Forrest House Holding Co. (234 AD2d 491, 492 [2d Dept 1996]), and declining to follow Yankee Bank

*for Fin. & Sav., FSB v Task Assoc., Inc.* (731 F Supp 64, 71 n 2 [ND NY 1990]).

Accordingly, Supreme Court granted Hayner's motion and Merit's and Pike's cross motions to the extent they argued their mechanic's liens were superior to Altshuler's mortgage. The judge further agreed with Merit that its lien was superior to Hayner's under Lien Law § 56 "because it was a subcontractor to [Hayner] as general contractor" (*id.* at 482); and turned down Pike's argument that "its lien [was] superior to all others pursuant to section 13 [of the Lien Law] because it performed labor" (*id.*). Altshuler appealed Supreme Court's ensuing order, entered May 20, 2010.

On April 29, 2011, the Appellate Division affirmed "for reasons stated in the decision at Supreme Court" (83 AD3d 1563, 1563 [4th Dept 2011]). The Court did not address Altshuler's argument that the 2007 loan agreement was merely "a preliminary agreement that expired before the mortgage at issue was filed" because this contention was "raised for the first time on appeal and could have been obviated or cured by factual showings or legal countersteps in Supreme Court" (*id.* [internal quotation marks omitted]).[4] On July 1, 2011, the same panel denied Altshuler's motion for leave to appeal to us (86 AD3d 934 [4th Dept 2011]).

On October 26, 2011, Supreme Court issued an agreed-upon "Final Order for Judgment of Foreclosure and Sale," which awarded Altshuler a judgment of $10 million; dismissed Altshuler's causes of action seeking a declaration that its mortgage enjoyed first priority; set out the priority and amounts of the mechanic's liens; ordered sale of the tower and Addis buildings;[5] and directed the referee to file his report afterwards. The order also stayed the foreclosure sale of the tower building pending disposition of Altshuler's appeal. Since Altshuler contested only the priority of rights to the proceeds from the sale, however, we

---

4. Although not pursuing the option in this case, the Appellate Division may, in the exercise of its "interests of justice" jurisdiction, always reach an issue not preserved at Supreme Court (*see Martin v City of Cohoes*, 37 NY2d 162, 165 [1975]). The Court of Appeals, by contrast, generally lacks power to review unpreserved issues even where the Appellate Division has chosen to do so (*see Brown v City of New York*, 60 NY2d 893, 894 [1983]; *see also Hecker v State of New York*, 20 NY3d 1087, 1087 [2013]).

5. There were no mechanic's liens filed against the Addis building, which sold at public auction on August 7, 2012 for $200,000. Altshuler was paid $198,750, the sale proceeds less the referee's fee.

declined to apply the exception to the finality rule for irreparable injury, and dismissed Altshuler's appeal on February 9, 2012 (18 NY3d 892 [2012]); on May 3, 2012, we denied reargument (19 NY3d 837 [2012]). In the meantime, Supreme Court, by order signed March 29, 2012, vacated the stay of enforcement.

The tower building was sold at public auction on June 6, 2012 for $1,396,633.82, and Supreme Court confirmed the referee's report on July 12, 2012. Hayner was the purchaser.[6] Altshuler then again sought leave to appeal, which we granted on October 23, 2012 (19 NY3d 814 [2012]).

## II.

Section 22 of the Lien Law requires that a building loan contract, with or without the sale of land and before or simultaneously with the recording of a building loan mortgage made pursuant to it, must be filed in the clerk's office of the county where land subject to the contract is located, along with a borrower's affidavit stating the consideration paid or to be paid for the loan, any expenses incurred or to be incurred in connection with the loan, and the net sum available for the construction project. Section 22 also mandates the filing of any subsequent modifications of a building loan contract within 10 days after their execution. Failure to comply with these filing requirements changes the ordinary priority of liens, with a properly filed mechanic's lien taking priority over the interests of the parties to the contract.[7] Thus, a construction lender must

---

**6.** The tower building's sale price was just sufficient to pay Pike, to pay Hayner's subcontractors, to reimburse Altshuler for expenses incurred during the pendency of the foreclosure, and to pay the referee's expenses, with $1,711.89 left over to refund to Hayner.

**7.** Section 22, in relevant part, states as follows:

"A building loan contract either with or without the sale of land, and any modification thereof, must be in writing and duly acknowledged, and must contain a true statement under oath, verified by the borrower, showing the consideration paid, or to be paid, for the loan described therein, and showing all other expenses, if any, incurred, or to be incurred in connection therewith, and the net sum available to the borrower for the improvement, and, on or before the date of recording the building loan mortgage made pursuant thereto, to be filed in the office of the clerk of the county in which any part of the land is situated, except that any subsequent modification of any such building loan contract so filed must be filed within ten days after the execution of any such modification. . . . *If not so filed the interest of each party to such contract in the real property affected thereby, is subject to the*

(n. cont'd)

file the building loan contract in order to achieve lien priority, or, put the opposite way, the statute imposes a so-called "subordination penalty" on a lender who does not do this. We have said that the legislature enacted section 22 to permit contractors on construction projects "to learn exactly what sum the loan in fact made available to the owner of the real estate for the project" (*Nanuet Natl. Bank v Eckerson Terrace*, 47 NY2d 243, 247 [1979] [holding that section 22 subjects a lender's interest to the subordination penalty when the lender knowingly files a materially false borrower's statement]).

Section 2 (13) of the Lien Law, defines a "building loan contract" as

> "a contract whereby a . . . 'lender,' in consideration of the express promise of an owner to make an improvement[8] upon real property, agrees to make advances to or for the account of such owner to be secured by a mortgage on such real property, whether such advances represent moneys to be loaned or represent moneys to be paid."

And a "building loan mortgage" is "a mortgage made pursuant to a building loan contract . . . includ[ing] an agreement wherein and whereby a building loan mortgage is consolidated with existing mortgages so as to constitute one lien upon the mortgaged property" (Lien Law § 2 [14]).

█ The 2007 loan agreement is a building loan contract as defined under section 2 (13) of the Lien Law: the agreement called for transfer of $4.5 of the $10 million deposited by Altshuler into the trust account to a dedicated bank account of GML Tower/Ameris (the restricted account), to be "released if, when and as required to finance and pay [for] the construction of" the improvements to the tower building, "subject to the terms and conditions of" the construction plans, and these loan proceeds were to be secured by a mortgage. Because the 2007 loan agreement was a building loan contract, Lien Law § 22 obligated Altshuler to file the agreement in the Onondaga County

---

> lien and claim of a person who shall thereafter file a notice of lien under [the Lien Law]" (emphasis added).

**8.** Section 2 (4) of the Lien Law defines "improvement" to include, among other things,

> "the demolition, erection, alteration or repair of any structure upon, connected with, or beneath the surface of, any real property and any work done upon such property or materials furnished for its permanent improvement."

Clerk's office prior to the recording of any mortgage made pursuant thereto, or suffer loss of lien priority. Altshuler never filed the 2007 loan agreement; it recorded the 2007 mortgage on May 3, 2007.

Altshuler counters that the 2007 mortgage was not recorded "pursuant [ ]to" the 2007 loan agreement as required by Lien Law § 22; however, the recorded mortgage states that it is "to secure . . . payment and/or performance of all indebtedness and obligations of [GML Tower] and/or Ameris described in the [2007 loan agreement]." Additionally, the 2007 loan agreement directed that Altshuler's security interest in the property be "perfected and duly recorded" in Onondaga County, and the agreement defined a security interest to include a mortgage. In short, the 2007 mortgage was made pursuant to the unfiled agreement.

Next, the 2008 amendment is explicitly labeled an "amendment" to the 2007 loan agreement, designed to "amend the terms and conditions for release of the [r]emaining [f]unds" to GML Tower and Ameris, and to "revise" the improvement plans in the agreement to fit the new plan to construct rental apartments rather than condominiums. In fact, the 2008 amendment is not a stand-alone document; it is essentially a compilation of edits of various provisions in the 2007 loan agreement, and must be read together with that earlier document in order to be intelligible. Altshuler never filed the 2008 amendment. This was another violation of section 22, which specifies that modifications of building loan contracts must be filed.

Altshuler contends, though, that assuming the 2007 loan agreement is a building loan contract (and we have now held that it is), the 2008 amendment converted the agreement into a standard loan contract, and the 2008 mortgage was recorded pursuant to the amendment, not the agreement. But even if Altshuler is correct that the 2007 loan agreement, as modified by the 2008 amendment, was no longer a building loan contract as defined by Lien Law § 2 (13)—a question we need not and do not decide—it does not follow that Altshuler was relieved of the obligation to file the amendment. Lien Law § 22 does not state that modifications to a building loan contract must be filed *only* so long as the contract, as modified, remains a building loan contract within the meaning of the Lien Law. This makes sense, given that the reason for public filing is to allow any interested contractors, subcontractors and material suppliers to discover the level of financing available for construction so that they

might guide their actions accordingly (*see Nanuet*, 47 NY2d at 247). Further, if the 2007 loan agreement had been filed, as it should have been, Altshuler's failure to file the 2008 amendment clearly would have violated the statute.[9] Altshuler should not benefit from an earlier violation of the law.

## III.

Finally, we consider whether Altshuler is entitled to priority with respect to the $5.5 million of the loan proceeds used to refinance the existing mortgage, which covered the tower building, the Addis building, and the hotel property. Before this litigation, the *Atlantic Bank* and *Yankee Bank* courts considered whether a subordination penalty applies to funds loaned in a building loan contract for financing the purchase of the property on which the improvements are to be made. They reached opposite conclusions.

---

**9.** Although section 22 states that *"any* subsequent modification" (emphasis added) to a building loan contract must be filed, this language, which also appeared in section 22's predecessor statute, former Mechanics' Lien Law § 21, has always been interpreted to mean any "material" subsequent modification (*see Pennsylvania Steel Co. v Title Guar. & Trust Co.*, 193 NY 37, 42 [1908], *rearg denied* 193 NY 682 [1908]). The Appellate Divisions have set out a test for determining when a modification qualifies as material (*see HNC Realty Co. v Bay View Towers Apts.*, 64 AD2d 417, 426 [2d Dept 1978] ["a modification of a building loan contract is 'material' if it (1) alters the rights and liabilities otherwise existing between the parties to the agreement or (2) enlarges, restricts or impairs the rights of any third-party beneficiary"]; *Howard Sav. Bank v Lefcon Partnership*, 209 AD2d 473, 475 [2d Dept 1994] [same]). In the absence of precedent from our court, the federal courts have applied the *HNC Realty* test (*see Yankee Bank*, 731 F Supp at 70 [holding that unfiled modification was material because it restricted or impaired the rights of a third-party beneficiary]; *In re Lynch III Props. Corp.*, 125 BR 857, 861 [Bankr ED NY 1991] [holding that the unfiled modification was "not a material modification . . . within the meaning of section 22 of the New York Lien Law" because "(t)he rights of the mechanics' lienors, even if they would be third-party beneficiaries, have not been restricted or impaired and they retain all of the rights that exist under the filed Building Loan Agreements"]; *but see In re Admiral's Walk, Inc.*, 134 BR 105, 121 [Bankr WD NY 1991] [criticizing *HNC Realty*, and suggesting that the underlying facts in cases considering the materiality of a modification have never shown that "alteration of rights as between the lender and borrower is . . . alone sufficient to warrant subordination—there must also be some element of impairment of rights of section 22 beneficiaries in order that a modification be so 'material' or 'essential' as to warrant its filing, on penalty of subordination"]).

We do not need to address the proper test for materiality on this appeal. By arguing that the 2008 amendment transformed the fundamental character of the 2007 loan agreement, Altshuler effectively concedes that the amendment worked a material modification under any conceivable test.

In *Atlantic Bank*, a foreclosure action, the plaintiff bank sought summary judgment against the mechanic's lienor defendants on the ground that its recorded mortgage had priority, at least to the extent of the $2.2 million loan given by it to the borrower for land acquisition. Applying a liberal interpretation, the Appellate Division took inclusion of the phrase "either with or without the sale of land" in section 22 to "impl[y] that if a lender fails to comply with the requirements of the Lien Law, *its entire mortgage, including that part securing loan proceeds advanced for the purchase of the property*, would become subordinate to any subsequently filed mechanic's liens" (234 AD2d at 492 [emphasis added]).

*Yankee Bank* was a foreclosure action that was removed to federal court when the Federal Home Loan Bank Board found the plaintiff bank to be insolvent and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. The FDIC was consequently effectively substituted for the bank as plaintiff. The subject of the litigation was another building in Syracuse, New York, and the issue before the District Court Judge was the priority of rights to the foreclosure sale proceeds as between the FDIC and the mechanic's lienor defendants.

The Judge first decided that New York law supplied the rule of decision. In this particular case, the building loan contract between the bank and the developers allowed the bank to advance up to $610,000 for the acquisition of the building, and provided that no additional funds would be released until the developers obtained a surety payment bond. The bank, however, advanced funds beyond $610,000 without the required bond being in place. The mechanic's lienor defendants argued that this was an unfiled modification of the contract in violation of Lien Law § 22. The Judge agreed, and so held that the bank's mortgage would be subordinated to the defendants' interests. He then turned his attention to the question of the degree of subordination.

The building loan contract apparently earmarked this first advance of $610,000 for acquisition of the building, and the parties do not seem to have disputed that money loaned for this purpose was not subject to the subordination penalty. In this regard, the Judge observed that

> "[b]y definition a 'building loan contract' and 'building loan mortgage' only operate with respect to money lent for *improvements* on real property.

Therefore, the proceeds from the loan which were lent for the purchase of the property are not subject to the subordination penalty of Lien Law § 22" (731 F Supp at 71 n 2 [citation omitted]).

In fact, though, the amount of the loan proceeds expended to buy the building was only approximately $250,000. As a result, the dispute between the FDIC and the mechanic's lienor defendants centered on whether the FDIC had a first priority lien in the foreclosure sale proceeds for $610,000, or the lesser amount actually expended toward purchase of the building. The Judge ruled that the FDIC would enjoy first priority in an amount equivalent to what was actually spent (to be determined by the magistrate)[10] rather than the full $610,000 in the first advance, and the mechanic's lienor defendants would be paid any foreclosure sale proceeds beyond this amount.

This result is consistent with the language of Lien Law §§ 22 and 2 (3), (13) and (14), and does not contravene the statute's purpose, to give contractors and material suppliers notice of how much money a building loan makes available for construction. Section 22 does not state that the *entire* interest of each party to an unfiled building loan contract is subject to a later-filed notice of lien, and we do not infer such a limitation from the phrase "either with or without the sale of land," as did the *Atlantic Bank* court. As the *Yankee Bank* court pointed out, the subordination penalty logically applies only to funds loaned to pay for improvements. Here, the 2007 loan agreement

---

10. The dissent opines that the subordination penalty will "likely . . . prove difficult to enforce" if loan proceeds for property acquisition are excluded from its scope, commenting that "it may be difficult to discern precisely what proportion of a loan was earmarked for acquisition expenses and what portion was actually expended for that purpose," pointing to the referral to the magistrate in *Yankee Bank* as an example (dissenting op at 372). First, there does not seem to have been much dispute in *Yankee Bank* over how much of the loan was actually applied to the building's purchase price (there was a deed filed in the county clerk's office, after all). Rather, the record was apparently incomplete on this score because the magistrate had concluded that the rights of the mechanic's lienor defendants were to be determined with reference to the amount committed by the loan agreement toward acquisition rather than the amount actually spent for that purpose. In this case there is no difference between the amount of the loan "earmarked" and "actually expended" to refinance the loan made to acquire the three properties making up the hotel complex—i.e., $5.5 million. This is probably by far the more common situation. In any event, given that the amount "earmarked" and the amount "actually expended" are identical in this case, we need not resolve and express no opinion as to which would be properly excluded from the scope of the subordination penalty in a case, like *Yankee Bank*, where there is a difference.

allocated $5.5 million of the loan proceeds to pay off the existing purchase-money mortgage. This tranche closed before any monies were advanced for construction, and the 2007 mortgage in this amount was recorded before any contractor began work on the project. The 2008 mortgage, which Altshuler foreclosed in this litigation, simply extended the reach of and increased the principal amount secured by the 2007 mortgage. We therefore conclude that $5.5 million of the loan proceeds, secured by the 2007 and 2008 mortgages, was not subject to the subordination penalty.

Accordingly, the judgment appealed from and the order of the Appellate Division brought up for review should be modified, without costs, in accordance with this opinion and, as so modified, affirmed.

GRAFFEO, J. (concurring in part and dissenting in part). I join that part of the majority opinion determining that the 2007 Loan Agreement was a building loan contract within the meaning of Lien Law § 22. However, because I read the plain language of the subordination penalty in this statute to apply to the lender's "interest . . . in the real property"—the total mortgage and not just the portion attributable to construction funds—I respectfully dissent from the majority's conclusion that $5.5 million of the loan proceeds was not subject to the subordination penalty.

As the majority explains, Lien Law § 22 establishes a recording requirement relating to a "building loan contract" as follows:

> "*A building loan contract either with or without the sale of land, and any modification thereof, must* be in writing and duly acknowledged, and must contain a true statement under oath, verified by the borrower, showing the consideration paid, or to be paid, for the loan described therein, and showing all other expenses, if any, incurred, or to be incurred in connection therewith, and the net sum available to the borrower for the improvement, and, on or before the date of recording the building loan mortgage made pursuant thereto, to *be filed in the office of the clerk of the county in which any part of the land is situated*, except that any subsequent modification of any such building loan contract so filed must be filed within ten days after the execution of any such modification" (emphasis added).

As a consequence of the failure to comply with the recording requirement, Lien Law § 22 imposes what has come to be known as the subordination penalty, providing that if the building loan contract is "not so filed the interest of each party to such contract in the real property affected thereby, is subject to the lien and claim of a person who shall thereafter file a notice of lien under this chapter." In other words, even though a lender's mortgage might have been recorded first, if it was issued pursuant to a building loan contract that was not properly recorded, the lender's mortgage loses its first-in-time priority and becomes subordinate to subsequently-recorded mechanic's liens.

The recording requirement is intended to benefit contractors, laborers and material suppliers who work on construction projects. Its purpose is "to readily enable a contractor to learn exactly what sum the loan in fact made available to the owner of the real estate for the project" (*Nanuet Natl. Bank v Eckerson Terrace*, 47 NY2d 243, 247 [1979] [inclusion of false information in building loan contract that was recorded triggered subordination penalty]; *see also Howard Sav. Bank v Lefcon Partnership*, 209 AD2d 473, 476 [2d Dept 1994], *lv dismissed* 86 NY2d 837 [1995]), and to preclude lenders and owners from entering into "secret agreements" in that regard.

Plaintiff lender argues—and the majority accepts—that Lien Law § 22 does not require that the subordination penalty apply to the entire mortgage but covers only the portion relating to the advancement of construction funds. It further asserts that, since the purpose of the statute is to protect contractors, laborers and material suppliers, it makes no sense to preclude a lender from claiming priority with respect to the portion of the loan that had nothing to do with construction but related to the initial acquisition of the property. In my view, this argument should be rejected because the plain language of the statute directs that the full mortgage interest—not just the part securing the funds used for construction purposes—is subject to the subordination penalty, as two New York courts had held before the Appellate Division reached the same conclusion in this case (*see Atlantic Bank of N.Y. v Forrest House Holding Co.*, 234 AD2d 491 [2d Dept 1996]; *HNC Realty Co. v Golan Hgts. Devs.*, 79 Misc 2d 696 [Sup Ct 1974]).

Critically, Lien Law § 22 begins by indicating that the statute applies to "[a] building loan contract *either with or without the sale of land*," thereby contemplating building loan agreements in which money is loaned both to purchase the property and

construct improvements. Thus, just because some of the funds disbursed relate to the acquisition of the real property to be improved (or, in this case, the refinance of a mortgage previously used to acquire the real property to be improved), this does not prevent a loan agreement that otherwise meets the building loan contract criteria from being subject to the recording rule (as the majority also concludes). It is therefore clear that the legislature understood that there would be contracts like the one here where acquisition funds and construction monies would be addressed in a single loan secured by a mortgage. Nonetheless the subordination penalty that appears later in the statute does not include any language indicating an intent to exclude that portion of a mortgage securing acquisition funds from its scope. Rather, it provides, in broad terms, that *"the interest of each party to such contract in the real property affected thereby*, is subject to the lien and claim of a person"* who later files a mechanic's lien (Lien Law § 22 [emphasis added]). It is the "interest" of the lender "in the real property" that is subordinated to later-filed mechanic's liens—and the lender's interest in the real property is reflected in the entire mortgage, not merely a portion of it. As the Appellate Division explained in *Atlantic Bank*,

> "if a lender fails to comply with the requirements of the Lien Law, its entire mortgage, including that part securing loan proceeds advanced for the purchase of the property, would become subordinate to any subsequently filed mechanic's liens. This interpretation is consistent with the overriding concern that the lender is the party responsible for compliance and that the threat of the loss of priority is an effective deterrent against a lender shirking this responsibility . . . To the extent that this outcome may be harsh, it must be understood that we are here dealing not with equitable redress, but with a statutorily imposed penalty" (*Atlantic Bank*, 234 AD2d at 492 [internal quotation marks and citation omitted]).

In arguing to the contrary, the lender relies on *Yankee Bank for Fin. & Sav., FSB v Task Assoc., Inc.* (731 F Supp 64 [ND NY 1990]), a federal district court decision that was issued before the Appellate Division decided *Atlantic Bank*. Although the majority finds this case to be persuasive, I believe that reliance is misplaced. First, as the majority acknowledges, in *Yankee*

*Bank* neither party asserted that funds used for acquisition of the building were subject to the subordination penalty so the court was not confronted with the precise issue presented here. Second, without addressing the plain language in the subordination penalty, the District Court held in summary fashion that the lender retained its first priority interest in the foreclosure sale proceeds "only up to that amount actually expended toward the purchase of the . . . building," with the remainder of its interest subordinated to the mechanic's lienors (731 F Supp at 71-72). It is evident from a footnote that, rather than interpreting the subordination penalty itself, the court considered only the definitions of "building loan contract" and "building loan mortgage." Noting (erroneously, in my view) that these definitions relate only to monies advanced for improvements on property, the court reasoned that "the proceeds from the loan which were lent for the purchase of the property [were] not subject to the subordination penalty" (731 F Supp at 71 n 2). But I believe that the Lien Law takes a more encompassing view. Section 22 makes clear that the subordination penalty applies to a building loan contract, regardless of whether it involves the sale of land, and then indicates it is the lender's *interest in the real property* that is subordinated. The lender's interest in the property is the total mortgage, not just the portion that correlates to the loan of construction funds. I therefore prefer the better-reasoned New York precedent.

Since the statutory language warrants a finding that the entire mortgage is subordinated when a building loan contract is not recorded, both Supreme Court and the Appellate Division properly concluded in this case that the lender's $10 million mortgage was subordinate to the mechanic's liens. Although this appears to wipe out any recovery for the lender, the legislature adopted this statutory penalty to dissuade lenders from engaging in the very conduct that occurred here: failing to comply with the building loan contract recording requirement. Here, none of the agreements relating to this loan were recorded: not the Loan Agreement, the Memorandum of Understanding nor Amendment No. 1, which was executed contemporaneously with the 2008 mortgage. And timely filing of documents and amendments is particularly necessary in cases such as this where aspects of the loan fail to close on time and material terms are amended while the project is ongoing—facts that can raise red flags to interested contractors, laborers and material suppliers if revealed.

I believe that the rule the majority has fashioned is antithetical to the purpose of the penalty and is likely to prove difficult to enforce. The subordination penalty is triggered when a lender fails to record a building loan contract or amendments thereto, or when information in filed agreements proves to be false. The burden it imposes on lenders is minimal—the statutory requirement is met merely by filing the pertinent documents in the county clerk's office. One of the purposes behind the recording requirement is to make future contractors, laborers and material suppliers aware of the funds available for construction so that, prior to working on a project, they can make knowledgeable decisions concerning the amount of labor or materials to expend and the type of payment and security terms to demand. When acquisition funds are part of the loan, this necessarily diminishes the amount available to fund improvements on the real property. But if contractors are unaware of the extent to which the loan covers acquisition costs due to the failure to file a building loan contract, they may expend more labor and materials, and on different terms, than would have been the case had they been provided with the accurate information that the statute requires.

Moreover, if documents are not timely filed prior to the recording of the mortgage, resulting in the terms of the loan not being reflected in the public record, courts will be left to reconstruct the loan agreement between the lender and the building owner after the fact during a foreclosure action or other litigation when there may be disputes concerning the scope of the contract and the intent and effect of various written and oral modifications. This problem is apparent here where the lender's view concerning the terms of the arrangement— whether certain documents were superceded or remained in effect—has evolved over the course of litigation and where the defaulting borrower did not participate and clarify the record. The bottom line is that, after a deal has gone south, it may be difficult to discern precisely what proportion of a loan was earmarked for acquisition expenses and what portion was actually expended for that purpose (a dispute of that kind apparently arose in *Yankee Bank*)—and the courts, as well as the contractors, laborers and material suppliers will be at the mercy of the parties to the loan to resolve the controversy. Timely recording of the proper documents when the loan occurs and prior to the filing of the mortgage obviates this problem. Of course, the subordination penalty will only come into play when that

has not happened and I fear that the rule the majority adopts today will add to the confusion.

For all of these reasons, I conclude that the majority's bifurcation rule unnecessarily complicates the application of the subordination penalty which, as constructed by the legislature, should be straightforward and require nothing more than giving the lender's mortgage the priority it would have had if it had been recorded after the mechanic's liens. The legislature appears to have made a considered decision that as between the lender, who could have protected its investment in full merely by timely recording its documents, and the contractors, laborers and material suppliers, who were inappropriately kept in the dark, it is the lender who should bear the loss. It is not for the courts to disturb that decision by creating a limitation on the subordination penalty that does not appear anywhere in the statute. Because the majority does so, I respectfully dissent from the majority's opinion to the extent that it holds that $5.5 million of the loan proceeds was not subject to the subordination penalty.

Chief Judge LIPPMAN and Judges SMITH, PIGOTT and RIVERA concur with Judge READ; Judge GRAFFEO dissents in part in an opinion; Judge ABDUS-SALAAM taking no part.

Judgment appealed from and order of the Appellate Division brought up for review modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.